[Philadelphia, March 30th, 1839.]

## M'CARTY *against* GORDON.

### IN ERROR.

1. A bond given to secure the payment, on the widow's death, of the one-third of the valuation of the real estate of an intestate, may be binding on the surety in such bond, although not required by the act of 1794.
2. It is not necessary to resort to the land bound for the payment of such third, before proceeding against the surety in such bond.
3. The lapse of nineteen years after the death of such widow, without suit on the bond, was held not to raise the presumption of the payment of the amount, so as to discharge the surety.
4. It is error to submit a matter as a question of fact to the jury, in the absence of all evidence tending to prove it.

Error to the Court of Common Pleas of the County of Bucks, to remove the record of an action of debt brought by Catharine Gordon, (late Kohl) one of the daughters of George Kohl, deceased, against John M'Carty, one of the sureties in a bond given in the Orphans' Court of Bucks county, on the 29th of March, 1810, by Jacob Kohl and George Kohl, sons of the said deceased, to whom the real estate of their father was adjudged by the said court, for the distributive share of the plaintiff, in the valuation of her father's estate. The action was brought to recover that portion which became due and payable at the decease of the widow of the intestate. The suit was instituted on the 13th of May, 1835.

The defendant pleaded payment, with leave to give the special matter in evidence, &c.; and upon this issue the cause came on for trial, before Fox, President, on the 11th of September, 1837, when the jury, under the direction of the Court, found for the plaintiff. A writ of error was taken, and the cause removed to this Court, where the judgment was reversed, and a *venire de novo* awarded.*

The record having been remitted, the cause came on again for trial, before the said Court, when the plaintiff gave in evidence the bond upon which the action was brought, and proved the death of the widow in the month of July, 1816.

* See 3d Wharton's Rep. 407, (*Gordon v. M'Carty.*)

(M'Carty *v.* Gordon.)

The defendant gave in evidence the following instrument:

" To all people to whom these presents shall come, be it known, that I, Catharine Gordon, late Catharine Kohl, one of the children and heirs of George Kohl, late of the township of Plumstead, deceased, do hereby acknowledge that I have received of Jacob Kohl, my full distributive share out of the real estate of my said father ; and I do hereby in consideration aforesaid, direct and authorize the clerk of the Orphans' Court, in and for the county of Bucks, for me and in my name, to enter satisfaction upon the Orphans' Court Bond, given by George Kohl and Jacob Kohl, with Isaac Michener and John G. M'Carty, as their sureties, for my distributive share out of the estate of my said father George Kohl. In witness whereof, I have hereunto set my hand and seal, this first day of September, A. D. 1824.

Sealed and delivered in presence of

Abraham Kulp."

                                              her
                           CATHARINE ⋈ GORDON."
                                             mark.

The plaintiff contended, that the above instrument was obtained from her through the false representations of Jacob Kohl, and offered Mary Jane M'Carty as as a witness to prove the conversation that took place between the plaintiff and Jacob Kohl at the time the release was executed.    She testified that she was a daughter of Mrs. Gordon, the plaintiff; that she recollected Jacob Kohl coming to her mother's house with a paper; that she lived in Plumstead at the time, about a mile above Meyer's tavern, that her mother and she lived alone in one part of the house.    Kohl came alone and wanted her to sign the paper, she said she did not like to do it, she did'nt understand it, and could neither read nor write ; that he then said it was for her own safety, and was nothing that went against her ; he persuaded her it was for her own safety, till he got her willing to sign it ; she told him that she trusted to him, that he was the only friend she had ; that they then sent the witness for Kulp, the witness to the release, who came to the house ; that her uncle Kohl wrote her mother's name and she made the cross.    Kulp witnessed it.    She did not recollect that the paper was read ; that Kohl did not undertake to explain it to her in any other way, except that it was for her own safety.    Kulp was there but a short time ; she did not recollect that Kohl explained it to Kulp.    She (the witness) knew of the paper, and always thought it was for her mother's safety, until it came out since the suit was brought.    Her mother went about working for her living ever since she remembered, and has been living with her ever since she was married.    She (the witness,) was married two years ago last February.    She and her mother lived alone together ever since she remembered any thing ; they had a room to themselves, and lived out in the country all the time ; that Jacob

(M'Carty *v.* Gordon.)

Kohl gave her money as he did before, four or five dollars at a time, once or twice a year; that Kohl always told her that she should wait till he got out of debt, and he would pay her. This was said after she signed the paper; and he said so as long as he lived here and owned the tavern. He left the tavern seven years ago last spring. The next winter after he moved to Philadelphia, she and her mother went down, and she asked him for money; he denied her, and said she might go to the rest, he was not going to give her any more, she might see where she got it. She never heard him mention any thing about the release at the time she asked him for money, or at any other time. That she saw M'Carty's daughter at her mother's first before the suit was brought.

Being cross-examined, she said that George Deterly lived at the house when the release was signed. That she was twenty-two years of age in August last; was born in 1816. That Kohl continued in the house while she went for Kulp. Deterly's brother was there, but he was under age and would not do. Her mother worked at any kind of work she could get, going out into the field, spinning or any thing else. Kohl was the nearest relation she had, the rest lived in Philadelphia or Haycock. Her mother said he was the only friend she had, and she hoped that he would see that she got her money; he said he would. Sometimes when she asked for money, he would talk about building a house to put her off; nothing was said about the house when the paper was executed. In Philadelphia he said nothing about debt. She was ten or eleven when the paper was signed; her mother could not read writing or write. Kohl paid no money at the time of the execution of the release.

The plaintiff also offered Abraham Chapman, Esq. as a witness, who testified that Jacob Kohl and M'Carty came to his office and got the release drawn; it was somewhere about the time M'Carty was in difficulties, that the release was drawn. The witness was M'Carty's counsel, when the application for the benefit of the insolvent laws was made: was first consulted by Kohl as to drawing the release and then by Kohl and M'Carty. Some releases were got from other heirs. From what they said at the time, and what he observed, he thought the woman would lose her money. His impression was, that if she executed the instrument, without knowing it, she would lose her rights. From the manner in which the release was drawn, he was induced to suspect it was designed to defraud her. Kohl said, in this case, the money was not all paid.

The plaintiff also offered in evidence, the petition of John M'Carty, for the benefit of the insolvent laws, filed on the 16th of February, 1826, in which he returned the plaintiff as a creditor as follows:

"Catharine Gordon, late Kohl, as surety in Orphans' Court bond, $1198,62."

(M'Carty *v.* Gordon.)

The condition of the bond upon which the suit was instituted,
     was to pay in one year from the date,                     $799 08
And at and immediately after the death of Catharine
     Kohl, widow of George Kohl,                                 399 54
                                                             ──────────
                                                               $1198 62

The defendant's counsel requested the Court in charging the jury,
to give their opinion on the following points:

" 1. That the one-third of the valuation of the real estate of George
Kohl, deceased, taken in the Orphans' Court by his sons, Jacob and
George Kohl, was a lien upon such real estate.

2. That the defendant who is one of the sureties on the bond,
upon which the present suit was brought, was not required by the
act of Assembly, 19th of April, 1794, sec. 22, to secure the pay-
ment of the principal sum, which became due to the plaintiff at the
death of the widow of George Kohl, deceased, and that therefore
that part of the condition of the bond given for such sum is not
obligatory or binding upon him.

3. That no recovery can be had of the defendant at this time, on
the bond, which is the foundation of the present action.

4. That according to the directions of the act of 19th April, 1794,
sec. 22, the heir taking land at the valuation in the Orphans' Court,
is not bound to give personal security for the payment of the one-
third thereof, which becomes due at the death of the widow, but
that such payment is made a lien on the land, and such heir, his or
her heirs or assigns, holding the premises at the death of the widow,
shall pay the principal sum then due.

5. That under the circumstances of this case, and in conformity
with the act of 19th April, 1794, sec. 22, the plaintiff is not entitled
to recover against the defendant, (if at all), until after she has pro-
ceeded against and exhausted the land upon which the present claim
was a lien.

6. That the plaintiff, by neglecting to proceed against the land,
bound for the payment of her claim, and twenty-one years having
expired since her claim was due, has deprived the defendant of his
right to be substituted in her place, in respect of his remedy upon
the land, and therefore she cannot recover against him.

7. That if the plaintiff neglected to bring suit upon the bond, or
give notice to the defendant of the release having been obtained of
her through the false and fraudulent representation of the principal
in the bond, for a period of ten or eight years after the discovery of
the fraud, the release would operate as a discharge to the surety.

8. That if the jury believe that the plaintiff was at the time of the
execution of the release, made acquainted with its contents and the

(M'Carty v. Gordon.)

effect of it, and voluntarily agreed to execute it, the release would be binding upon her."

The Court answered these propositions as follows:

To the first proposition—" This is correct; it is expressly so made by the act of 19th April, 1794."

To the second proposition.—" If the principal was legally required to give the bond, his sureties are bound. The act of assembly requires the child taking the land, to pay to the other children their equal proportion of its appraised value, or give good security for the payment thereof, in some reasonable time not exceeding twelve months. In the present case the Orphans' Court required the bond in question to be executed in accordance with a practice, which is believed to have existed from the passage of the law. The Court had a right to require it to be given, as it is given for the payment of the whole of the distributive shares, and it bound both principal and surety."

To the third proposition.—" I see no legal bar to a recovery in this case."

To the fourth proposition.—" It is not necessary to answer this proposition, further, than to refer to the answer to the second proposition."

To the fifth proposition.—" There is no evidence in the cause to show how the plaintiff was situated in regard to the land. There is no evidence of any notice given by the defendant, or any one else, to the plaintiff to pursue the land ; and so far as appears from any evidence, she was not bound to proceed against the land and exhaust it before a recovery can be had in the suit.

To the sixth proposition.—" This is not correct."

To the seventh proposition.—" This is already answered."

To the eighth proposition.—" This is correct."

The Court also charged the jury in substance as follows:—

" This is an action upon what is commonly called, an Orphans' Court bond, against a surety, and the claim is for the amount payable at the death of the widow. The bond is admitted, but the defendant sets up several matters in defence. He produces a release from the plaintiff to Kohl, the principal in the bond, who was brother of the plaintiff. The effect of this release is, (if all be right), to discharge the sureties as well as the principal. In reply to the defence of a release, however, the plaintiff admits its execution, but avers that she is not bound by it, as it was obtained from her by fraud. Whether it was obtained of her by fraud, and the effect of the fraud, if any, upon the defendant, are the main questions in the cause. Was the release obtained by fraud? If it were so obtained, what is the effect? If it were obtained by the fraud of Kohl, (the principal)

alone, what would be the effect? The release may be void as respects Kohl, and not void as respects his sureties, depending upon the principles, I shall proceed to lay down. Of the weight of the evidence to prove the fraud, the jury are the sole judges, they are to say whether they believe it; they may reject it entirely, or accept such facts as they believe worthy of credit. The plaintiff alleges, that she has given sufficient evidence to show that Kohl and M'Carty conspired to procure this release from her, without her knowing its force and effect. That she was a very ignorant woman who relied wholly upon her brother Jacob Kohl, the principal in the bond, to take care of her interests. [The Judge then stated the substance of the evidence.] Any one by fair persuasion may induce another to release his claim upon a bond, but if one employ falsehood, and the misrepresentation that a release of a bond is necessary to be executed for the safety of the releasor, and the other party executes it under that supposition, and does not know nor has it explained to him, that his rights in respect to the bond will be released, he is not bound by any act of releasing, which he does under such circumstances. If such a case as the one supposed, is now made out by the plaintiff, she is not bound by the release, but it is void, at least so far as Jacob Kohl is concerned. The release, however, may be void as respects Jacob Kohl, but yet may operate to discharge the sureties. If the plaintiff, it is said, discovered the fraud, and neglected to bring suit on the bond, or to give notice to the defendant, of the release having been obtained from her, through the fraudulent and false representations of the principal in the bond, for a period of ten or eight years after the discovery of the fraud, the release would operate as a discharge of the surety. This is certainly true, but it is for the jury to say, from the evidence when the plaintiff discovered that she had signed a paper which affected her right to receive the money on the bond. When did the defendant himself suppose he was released? Did he think he was released when he applied for the benefit of the insolvent laws, and gave notice to the plaintiff upon that application that he was still her debtor on that very account? Did this notice from the defendant tend to confirm the plaintiff in the belief that he was still bound to her? All that was required from the plaintiff in this particular, was that she should in a reasonable time, after the discovery of the fraud, give notice of it to the defendant, or bring suit. But if Mr. M'Carty conspired with Kohl to obtain this release by fraud and false representations, and the release was in fact so obtained, then the release is void as to him. He is still bound by the bond as firmly as if the release had never been executed."

The jury found for the plaintiff, and the defendant removed the record to this Court, and assigned the following errors:

" 1. The court erred in their answer to the defendants' second pro-

(M'Carty v Gordon.)

position, in saying, that if the principal was legally required to give
the bond, his sureties are bound, and that the Orphans' Court required
the bond in question to be executed in accordance with a practice
believed to have existed since the passage of the law, and that the
Court had a right to require it to be given as it is given for the pay-
ment of the whole of the distributive share, and that it bound both
principal and surety; and further erred in not admitting the defend-
ant's second proposition to be correct.

2. That the Court erred in their answer to the third proposition in
saying that they saw no legal bar to a recovery in the case.

3. The court erred in not answering the defendant's fourth point in
the affirmative, and in referring to their answer to the second pro-
position as an answer to the fourth.

4. The Court erred in not answering defendant's fifth point in the
affirmative, and also in stating to the jury in their answer, and
inducing them to believe that notice was necessary to be given by
the defendant to the plaintiff to pursue the land, and that from any
evidence that appeared, she was not bound to proceed against the
land and exhaust it, before a recovery could be had in the suit.

5. The Court erred in not answering defendant's sixth proposition
in the affirmative.

6. In not answering defendant's seventh proposition in the affirm-
ative."

Mr. *Dubois* and Mr. *Porter* for the plaintiff in error, argued,—

1. That the bond in this case was not binding upon the surety,
not being required by law; and the Act of Assembly having made
the proportion due at the death of the vendor, a lien on the land.
Upon this point were cited, *Cochran* v. *M'Knight*, (13 *Serg & Rawle*,
191.)   *Hutton* v. *Helme*, (5 *Watts*, 347.)   *Walton* v. *Willis*, (1 *Dall.*
265.)   *Classen* v. *Shaw*, (5 *Watts*, 468.)   *Allen* v. *Reeser*, (10 *Serg.*
& *Rawle*, 10.)

2. That if the bond was good, yet the plaintiff was bound to
resort to the land and exhaust it before she' could proceed on the
bond.   *Hawk* v. *Geddis*, (16 *Serg. & Rawle*, 23.)   *Geddis* v. *Hawk*,
(1 *Watts*, 280.)  *Lichtenthaler* v. *Thompson*, (13 *Serg. & Rawle*,
159.)   *Commonwealth* v. *Evans*, (1 *Watts*, 438.)

3. That after the lapse of time that occurred in this case, the
remedy against the surety was gone.   *Theobald on Sureties*, 256.
*Purviance* v. *The Commonwealth*, (17 *Serg. & Rawle*, 31.)   *Lenox*
v. *M'Call*, (9 *Serg. & Rawle*, 302.)

Mr. *Chapman* and Mr. *Miles*, contra, cited *Erie Bank* v. *Gibson*,
(1 *Watts*, 145.)   *Johnson* v. *Thompson*, (4 *Watts*, 446.)   *United
States* v. *Simpson*, (3 *Penn. Rep.* 439.)   *Earb's. Appeal*, (2 *Penn.
Rep.* 498.)

(M'Carty v. Gordon.)

The opinion of the Court was delivered by

KENNEDY, J.—The first, second, third and fourth errors assigned, present but two questions.   First, is the bond, upon which this suit is brought, having been taken to secure the payment of that portion coming to the plaintiff below, upon the death of the widow, of the one-third of the valuation-money of the real estate of the intestate, set apart for the widow's use during her life, as well as the plaintiff's portion of the other two-thirds thereof, void under the intestate law of 1794?   And secondly, seeing the money, sued for here, is made a lien, by the express terms of that law, upon the land or estate, of which it forms a part of the valuation-money, can it be recovered of the plaintiff in error, who was the defendant below, and a mere surety in the bond, upon his personal responsibility arising from it, without proceeding against the bond or estate so bound for the payment of it, and recovering therefrom, in the first place, all that can be had of it? or in other words, can the plaintiff in error be made liable in any event, under his bond, except for what the land may prove insufficient to pay, upon its being proceeded against first, and sold for that purpose?

Though the intestate law of 1794, passed the 19th of April in that year, may not be considered as directing the Orphans' Court, in case of an appraisement of the real estate of the intestate, made for the purpose of dividing it among those thereby entitled to it, where there is a widow living, to take *security* of the person, to whom the estate is decreed, for the payment of the one-third of such appraisement set apart for the use of the widow during her life, upon her death, to those entitled to it, yet there is certainly nothing in the act, which either expressly or impliedly prohibits the Court from doing so ; and having reason to believe that it has been the practice of the Orphans' Courts throughout the state, ever since the act came into operation, to require and take such security, with one or more sureties joined in a bond or recognizance, with the party taking the land at the appraisement, it would be highly improper as well as inconvenient now to declare such bond or recognizance void, as to any part of it, even as regards the sureties, upon the ground that the Orphans' Court is not directed or required to take it. The argument in favour of the plaintiff in error is, that the legislature intended, as is alleged, by the very terms of the act, that the party having a right to take the land at the appraisement, in the case of a widow still living, to whom he is to pay the interest of one-third of the appraisement annually during her life, should have the land upon his paying or securing to be paid, so as to satisfy the Court, the other two-thirds as the Court shall direct within twelve months thereafter, without becoming personally liable at all for the payment of the widow's third ; the payment of which is secured sufficiently, as is said, by its being made thereby expressly a lien upon the land : and hence

(M'Carty v. Gordon.)

even the requisition, by the Court, of his personal liability, and still more that of requiring him to give it with the addition of sureties, being, as it is contended, contrary to the spirit and meaning of the act, is therefore illegal and void. It is not clear, however, that such was the design of the legislature; but it is very certain that the practical construction of the act has been, ever since its passage, nearly half a century now, in opposition to that which is contended for, and sufficient, as we believe, to preclude any question being made in respect to it at this late day. This Court accordingly, not long since, in the case of *Good* v. *Good,* (7 *Watts,* 195,) decided that a recognizance taken in the Orphans' Court to secure the payment of the interest annually to the widow on one-third of the appraisement of the land, was good and binding upon the cognizor. The Court below were therefore correct in the instruction which they gave to the jury on this question.

Then as to the second question, it is contended for the plaintiff in error, that the land taken under the decree of the Orphans' Court, is the principal debtor; and being so, it ought to be looked to first for the payment of the money, and that the personal liability of the plaintiff in error under the bond, according to what must have been the understanding of the parties at the time of giving it, was, that it was only to be resorted to, in case of the land's proving insufficient to pay the amount, for the deficiency, whatever it might happen to be. Although the act of the 19th of April, 1794, makes the money claimed here, and so in all similar cases, a lien upon the land, yet it does not necessarily follow, that the land is to be considered the principal debtor more than the party himself taking it, and that all the other securities given for the payment of the money are to be regarded as a mere guaranty, or, more properly speaking, as the counsel for the plaintiff in error would have it, a mere conditional engagement to pay whatever sum cannot be had from a sale of the land being first made. If the legislature had intended to make the land alone liable for the payment of the money, without creating any personal liability on the party electing to take it at its appraised value; or had intended to make the land liable in the first place, with recourse, in case of deficiency, to the personal liability of the party afterwards, it is most likely that they would have prescribed some course of proceeding in order to have raised the money out of the land, without proceeding against the person; as it is far from being certain, that we had, at that time, any settled and known course of judicial procedure established by practice, whereby such end could have been attained : by act of assembly it is very certain, we had not. It seems, therefore, reasonable to conclude, that the legislature intended that the party taking the land at the appraisement, should be held personally liable as the principal debtor for the payment of the money; and for the greater security thereof, as the payment might be postponed to a very distant day by the life

of the widow, it was thought advisable that the land should be bound also for the payment of it. And certainly, so far as the practice under the act is to be regarded as evidence, not only of what the legislature intended, but of what has been ever the understanding of the party taking the land, and of those who have become his sureties, for the payment of the money, it has ever been universally thought, I believe, that they were bound *absolutely* by their bond or recognizance for the payment of the money at the day when the widow should die, and might therefore be resorted to in the first instance and required to pay it. Many suits for this purpose have been brought and sustained, without the objection having been made before, that I am aware of, and the money recovered without resorting to the land for it. We, therefore, think the Court below were right in their direction to the jury in regard to this second question.

There is nothing in the fifth error assigned: this is an exception to the answer given by the Court to the sixth point submitted, on the trial of the cause below, by the counsel there for the plaintiff in error. The lapse of twenty-one years, after the money became payable, did not release the land from the payment of it; nor did it raise even a presumption that the money was paid; because the institution of this action, which took place within nineteen years after the death of the widow, the time when the money became payable to the plaintiff below, rebutted or rather prevented the presumption of payment from arising; so that there is nothing in the bare lapse of time, which would prevent the plaintiff in error, if he should be compelled to pay the money as surety, from being subrogated to the right of the plaintiff below to enable him to proceed against the land for the purpose of reimbursing himself. But if it be true, as was said in the course of the argument, that Jacob Kohl, either before or after the release was given to him by the defendant in error, sold the land, and upon the faith of it received the purchase-money or the balance of it in full for the whole price to be paid for the land, this would prevent either of the parties here from going against the land in the hand of the purchaser or those claiming under him, if he purchased and paid his money, believing the release to be good, and without notice of its being claimed to have been obtained by fraud: and the plaintiff in error being thus deprived of his right to subrogation by the act of the defendant in error, would thereby be released from his liability in this action as surety, unless the release were procured by fraud from the defendant in error, and he was privy to or participated in the fraud. Nothing, however, appears upon the record now before us, to raise this question; but as the judgment must be reversed on account of the sixth and last error assigned, and the cause sent back for another trial, I have thought proper to notice it, so that if this fact can be shown to be, as stated by the counsel for the plaintiff in error, he may have a suitable direction from the Court below to the jury in regard to it.

(*M'Carty v. Gordon.*)

The sixth error is, that the Court below did not answer in the affirmative the seventh proposition submitted by the counsel of the plaintiff in error. By this proposition the Court were requested to instruct the jury, " that if the plaintiff neglected to bring suit upon the bond or give notice to the defendant of the release having been obtained of her, through false and fraudulent representations of the principal in the bond for a period of ten or eight years after the discovery of the fraud ; the release would operate as a discharge to the surety." The Court in reply say, " this is already answered," meaning, as it must be understood, in their general charge to the jury. The only part of the charge, which can be considered an answer to this seventh proposition, is in the following words, " the release, however, may be void as it respects Jacob Kohl, but yet may operate to discharge the sureties. If the plaintiff discovered the fraud aud neglected to bring suit on the bond, or to give notice to the defendant of the release having been obtained from her through the fraudulent and false representations of the principal in the bond, for a period of ten or eight years after the discovery of the fraud, the release would operate as a discharge of the surety." This is certainly true, but it is for the jury to say from the evidence when the plaintiff discovered that she had signed a paper, which affected her right to receive the money on the bond. All that was required of the plaintiff in this particular was, that she should in a reasonable time after the discovery of the fraud, give notice of it to the defendant or bring suit. But if " *M'Carty conspired with Kohl to obtain this release by fraud and false representaions, and the release was so in fact obtained, then the release is void as to him. He is still bound by the bond as surety as if the release had never been executed.*" This latter qualification superadded by the Court to the answer given by them to the seventh proposition of the plaintiff in error, that " *if he combined with Kohl to obtain the release by fraud,*" &c. is what is particularly complained of as being erroneous ; because no evidence had been given, which went in the slighest degree to prove such combination. Abraham Chapman is the only witness, who testifies to M'Carty's taking any part whatever in regard to the release : and all that he says, which can be received as evidence in respect to it is, " that Jacob Kohl and M'Carty came to his office and got the release drawn—that witness was first consulted by Kohl, as to the drawing of the release, and then by Kohl and M'Carty ; that some releases were got from the other heirs ; that Kohl said the money was not all paid to the plaintiff below." This witness has testified also as to what he *thought* at the time and *suspected ;* but what he *thought* or *suspected* cannot be regarded as evidence, and ought not to have been permitted to go to the jury. If the witness volunteered his *thoughts* and *suspicions* before he could be stopped, the Court ought to have told the jury, that they were not evidence, and ought to be thrown out of view altogether. This being all the

(M'Carty *v.* Gordon.)

evidence that was given to connect the plaintiff in error with procuring the release at any time, which showed merely that he had joined Abraham Kohl in a request to have it written, without showing that he had any concern with obtaining the execution of it, by either word or deed, it would seem to be very unreasonable to infer thence that he combined with Jacob Kohl to obtain the release by any means, no matter whether fair or fraudulent. As it is not pretended that M'Carty was present when the release was executed, or at any interview between Jacob Kohl and the plaintiff below when it was mentioned, or ever said a word to the latter on the subject, it is, therefore, utterly impossible that she could have executed or given it upon the faith of any thing that he either said or did. Neither does it appear that a word ever passed between Jacob Kohl and the plaintiff in error as to the means that should be employed for the purpose of obtaining it; nor does Kohl appear to have been disposed himself to misrepresent the case as it stood between him and his sister, the defendant in error, at that time; for he told Chapman that he had only paid part of the money to her; and that he did, is testified to by the daughter of the defendant in error. Doubtless Jacob Kohl told the plaintiff in error that his sister was willing to release him, and that he would obtain one from her; this was enough for the plaintiff in error, and it was not necessary that he should inquire farther or know more. According to the evidence, it was Kohl who called first on Mr. Chapman and consulted him about drawing the release; and afterwards the plaintiff in error called upon Chapman in company with Kohl, but nothing appears to have been said, from which it could possibly be inferred that any deception or falsehood was intended to be practised or used in order to obtain an execution of the release. On the contrary, Kohl frankly said then, that he had not paid all the money; so that it does not appear that there is even a spark of evidence tending to show a combination between Kohl and the plaintiff in error to obtain from the defendant in error a release by fraudulent or unfair means; or that the plaintiff in error was privy to, or participated in any fraud that may have been committed by Kohl in procuring the release to be executed. The Court, therefore, erred in submitting it, as a question of fact, to the jury, to be decided by them without evidence, which tended to prove it, whether such combination to defraud the defendant in error had not been formed.

It is impossible to avoid thinking, that injustice would be done to the plaintiff in error, if the verdict and judgment in this case were to prevail, even when tested by the defendant in error's own evidence. For, according to it, Jacob Kohl had, from time to time, paid small sums of money to her in discharge of her claim, and yet notwithstanding this, the jury gave a verdict, as it would seem, for *the whole amount of the original debt with interest thereon from the time it became payable, without any abatement on account of the*

(M'Carty v. Gordon.)

payments. This would unquestionably be the grossest injustice against a party, who had not the means of knowing what was so paid by Kohl, as the plaintiff below had, and therefore he could not be expected to exhibit and prove an account, showing the amount so paid; but the plaintiff below having received it, must have known what it amounted to, and ought therefore, as against a surety like the plaintiff in error, who could have no personal knowledge of it, to have produced an account crediting the bond with the amount thereof. Having, however, refused or declined to do this, the jury ought to have credited the defendant below with the largest possible sum that the evidence would have justified them in giving. This consideration, however, can have no weight in deciding all that we have any right to pass on, though in the Court below it might have been sufficient cause for granting a new trial. But it would seem, as if the most favourable view that could possibly be presented of the plaintiff's case below, was taken of it both by the Court and jury; and the most that could be imagined seems to have been made of the evidence in her favour. The defendant below was, from the evidence given, not only entitled to the benefit of the most perfect conviction, that the release had been executed by the plaintiff below, but likewise to the presumption that it was freely executed by and fairly obtained of her. It can scarcely be believed, that any chancellor would have set it aside on the evidence adduced by the plaintiff below. There is none whatever tending to lay the least ground for it, except that of her daughter, who says she was born in 1816; and the release from its date, it would seem, was executed in 1824, when the witness could only have been, at most, about eight years of age. However precocious she may have been at that age, it is not credible that she could have understood or known the meaning of the term "release," and hence although it may have been used and repeated in the conversation between Kohl and her mother at the time it was signed by the latter, and applied by them particularly to the instrument then as it was executed, it would be strange indeed, if she, knowing nothing of the import or meaning of the term, should have recollected it was used and applied to the paper then signed by her mother. Not only the term "release," but the subject-matter to which it had reference, must have been incomprehensible to, or, at least, very imperfectly understood by a child of her age. There is, therefore, great reason to believe that her feelings in favour of her mother which may be as strong as for herself, were it her own case, have operated most powerfully upon her mind, and worked her into an imaginary belief, which has supplied the place of recollection as to what passed at the time of signing the release. It is also a suspicious circumstance against the justice of the claim of the plaintiff below, that she lay by without moving in or bringing a suit for it after she had given the release, until death put the subscribing witness out of the way, so that he could not

(M'Carty *v.* Gordon.)

be brought forward to testify against her as to what was said or done at the time of its execution.

The judgment is reversed, and a *venire de novo* awarded.

Judgment reversed and a <em>venire de novo</em> awarded.